# Peyote Exemption for Native American Church

Regulation of the Drug Enforcement Administration (DEA) exempting peyote use in connection with the religious ceremonies of the Native American Church (NAC) from the controls and sanctions of the Controlled Substances Act of 1970 (CSA), accurately reflects Congress' intent to exempt the religious use of peyote by the NAC and other bona fide religions in which the use of peyote is central to established religious beliefs, practices, dogmas, or rituals.

An exemption for peyote use by the NAC would not violate the Establishment Clause of the First Amendment if the NAC had a constitutional right under the Free Exercise Clause to use peyote for religious purposes.

The NAC is an established religion, in whose history the sacramental use of peyote is firmly grounded, and in whose doctrine and ritual the use of peyote is central. Nonetheless, it is likely that Congress could, consistently with the Free Exercise Clause, constitutionally restrict or prohibit the continued religious use of peyote if this were the least restrictive means of achieving a compelling governmental purpose.

The exemption for the religious use of peyote contained in the CSA does not offend the Establishment Clause even if it is not required by the Free Exercise Clause. Under relevant Supreme Court precedent, the government may take actions necessary to avoid substantial interference with religious practices or beliefs, even if such actions are not required by the Free Exercise Clause, provided that the actions do not impose hardship on others or amount to government sponsorship or support of religion.

A statutory exemption limited to the NAC, to the exclusion of other religions whose use of peyote is central to established religious beliefs or practices, would be unconstitutional under the Establishment Clause if it discriminated among otherwise equally situated religions. No different conclusion would be required because the "preferred" religion is composed of American Indians, since the special treatment of Indians under our law is grounded in their unique status as political entities, not in their religion or culture. On the other hand, since no group other than the NAC is likely to be able to establish its entitlement to the exemption, the DEA would be justified in adopting procedures designed to minimize the administrative burdens of extending the exemption to other groups.

December 22, 1981

## MEMORANDUM OPINION FOR THE CHIEF COUNSEL, DRUG ENFORCEMENT ADMINISTRATION

Peyote, a hallucinogenic cactus, is listed as a Schedule I controlled substance in the Controlled Substances Act of 1970 (CSA), 21 U.S.C. §§ 801–966, and is subject to rigorous controls and sanctions with respect to manufacture, transfer, and possession. Your agency has interpreted the CSA to exempt peyote use in the religious ceremonies of the Native American Church (NAC), an American Indian religion. You have requested that this Office examine three issues arising in connec-

tion with the foregoing exemption: (1) what is the scope of the statutory exemption; (2) is the exemption constitutional; and (3) would it be constitutional to exempt only American Indian peyotists to the exclusion of other religious users of the drug.

We conclude, first, that Congress intended to exempt peyote use by the NAC and other *bona fide* peyote-using religions in which the actual use of peyote is central to established religious beliefs, practices, dogmas, or rituals. In administering this exemption, your agency could, consistently with the congressional intent, regard the absence of a significant history of such use as a meaningful or even presumptive factor in determining the availability of the exemption. As a practical matter, we believe that no religions other than the NAC would qualify for the exemption. Second, we conclude that the exemption as we have interpreted it does not offend the Establishment Clause of the First Amendment. Third, we conclude that it might well offend the Establishment Clause to limit the exemption to American Indian peyotists.

## I. Scope of the Statutory Exemption

The CSA's listing of peyote as a Schedule I controlled substance does not contain any express exemptions.[1] The exemption for the NAC is found in a regulation of your agency, 21 C.F.R. § 1307.31, which provides: [2]

> The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration. Any person who manufactures peyote for or distributes peyote to the Native American Church, however, is required to obtain registration annually and to comply with all other requirements of law.

This regulation is strictly an interpretative rule which construes the CSA in light of its legislative history; your agency does not assert authority to create nonstatutory exemptions from the listing of a substance in Schedule I.

The manufacture or distribution of peyote was first prohibited by federal law in the Drug Abuse Control Act Amendments of 1965 (1965 Amendments).[3] This statute's origin was in S. 2628, a bill which passed

---

[1] 21 U.S.C. § 812(c) Schedule I(c)(12). Schedule I substances are those which have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and lack accepted safety for use under medical supervision. *Id.* § 812(b)(1). The CSA subjects Schedule I substances to stringent registration, labelling, and recordkeeping requirements, and imposes criminal penalties for their unauthorized manufacture, possession, or transfer.

[2] *See also* 21 C.F.R. §320 3 (similar regulation of Department of Health and Human Services).

[3] Peyote was classified as a "narcotic" in the Narcotic Farm Act of 1929, 45 Stat. 1085, to enable peyote "addicts" to seek treatment at federal facilities. The Food, Drug and Cosmetic Act of 1938 also

Continued

the Senate during the Second Session of the 88th Congress. S. 2628 would have imposed controls on "psychotoxic drug[s]," which, as defined, included peyote.[4] There was no exemption for Indian religious use of the substance.[5] The Senate passed S. 2628 prior to the ruling of the California Supreme Court, in *People* v. *Woody*, 61 Cal. 2d 716, 40 Cal. Rptr. 69, 394 P.2d 813 (1964), that the Free Exercise Clause of the First Amendment prohibited the state from prosecuting a member of the NAC for using peyote in religious practices. The 88th Congress expired before the House had an opportunity to vote on S. 2628.

H.R. 2, introduced and passed in the House the following year, was similar in most essential respects to S. 2628. However, H.R. 2 explicitly provided that the term "depressant or stimulant drug" did not include "peyote (mescaline) but only insofar as its use is in connection with the ceremonies of a bona fide religious organization." *See* H.R. Rep. No. 130, 89th Cong., 1st Sess. 35 (1965). The purpose for the peyote exemption in H.R. 2 does not appear in the legislative history.[6]

H.R. 2 was introduced in the Senate and referred to the Committee on Labor and Public Welfare, which recommended passage of the bill but proposed to drop the special peyote exemption.[7] The Senate report explained this recommendation as follow:

> The Committee determined that it would not be desirable to specify drugs other than barbiturates and amphetamines as subject to the controls of the bill, but determined that the other classes of drugs are to be brought under control of the bill on a case-by-case basis by the Secretary of Health, Education and Welfare under the standards prescribed in the legislation. In accordance with this determination, the committee omitted specific reference to peyote as a substance subject to the provisions of the legislation. It is expected that peyote will be subject to the same consideration as all other drugs in determining whether or not it should be included under the provisions of the legislation.

S. Rep. No. 337, 89th Cong., 1st Sess. 3 (1965). The measure passed the Senate without further discussion of the peyote exemption.

When the Senate version of the bill, without the peyote exemption, was brought up for debate in the House, Congressman Harris, the Chairman of the Committee on Interstate and Foreign Commerce,

---

classifed peyote as a narcotic or hypnotic substance, 52 Stat. 1050, and imposed certain labelling requirements. Neither statute prohibited the manufacture or distribution of peyote.

[4] *See* 110 Cong Rec. 19,780 (1964).

[5] The Senate committee hearings on S. 2628 contain no reference to the religious use of peyote. *See Hearings on S. 2628 before the Subcomm. on Health of the Senate Comm. on Labor and Public Welfare*, 88th Cong., 2d Sess. (1964).

[6] *See* H.R Rep. No. 130, 89th Cong., 1st Sess. (1965); Hearings on H.R. 2 Before the House Comm. on Interstate & Foreign Commerce, 89th Cong., 1st Sess. (1965).

[7] The Senate committee did not hold hearings on the measure.

which had jurisidiction over the bill, gave the following explanation of the Senate amendment:

> Mr. Harris. The last amendment of substance made by the Senate deletes the provisions of the House bill which provided that the term "depressant or stimulant drug" does not include peyote used in connection with ceremonies of a bona fide religious organization.
>
> Some concern has been expressed by many of the religious groups affected,[8] and by certain civil liberties organizations concerning the possible impact of this amendment on religious practices protected by the first amendment to the Constitution.
>
> Two court decisions have been rendered in this area in recent years. One, a decision by Judge Yale McFate in the case of *Arizona* v. *Attakai,* No. 4098, in the superior court of Maricopa County, Phoenix, Arizona, July 26, 1960; and a California decision, *People against Woody,* decided August 24, 1964, in the Supreme Court of California. Both these cases held that prosecutions for the use of peyote in connection with religious ceremonies was a violation of the first amendment to the Constitution.
>
> In view of all this, I requested the views of the Food and Drug Administration and have been assured that the bill, even with [*sic* without] the peyote exemption appearing in the House-passed bill, cannot forbid bona fide religious use of peyote.
>
> Mr. Speaker, I ask unanimous consent to include the letter from the Food and Drug Administration at this point in my remarks.
>
> Dear Mr. Chairman: In response to your request we are stating the position the Food and Drug Administration expects to take if H.R. 2 becomes law as it passed the Senate with respect to the use of peyote in religious ceremonies.
>
> We have been advised by a representative of the North [*sic* Native] American Church that this church is a bona fide religious organization and that peyote has bona fide use in the sacrament of the church. The representative has agreed to document both of these statements.
>
> If the church is a bona fide religious organization that makes sacramental use of peyote, then it would be our view that H.R. 2, even without the peyote exemption which appeared in the House-passed version, could not forbid bona fide religious use of peyote. We believe that the constitutional guarantee of religious freedom fully safeguards the rights of the organization and its communicants.
>
> Sincerely yours,
>
> *George P. Larrick,*
> *Commissioner of Food and Drugs*
>
> Mr. Speaker, in view of the foregoing, I recommend that the House agree to the Senate amendments to H.R. 2.

---

[8] The legislative history does not explain which particular "religious groups" Congressman Harris was referring to.

111 Cong. Rec. 15,977–78 (1965). Shortly after the conclusion of these remarks, the House concurred in the Senate amendments.

In 1965, the Department of Health, Education and Welfare promulgated a regulation controlling peyote under the 1965 Amendments, but exempting the religious use of peyote by the NAC.[9] The exemption appears to have been based on the legislative history recited above.

Congress returned to the subject of drug abuse control in 1970 when it passed the CSA. That statute lists peyote as a controlled substance and, as noted above, does not provide for an exemption for the NAC or any other religion. However, officials of the Bureau of Narcotics and Dangerous Drugs [10] testified as to the effect of the proposed statute in hearings before the House Committee: [11]

> Mr. Satterfield. I have one other question. I recall when we were discussing dangerous drugs a few years ago, the question came up about the Native American Church involving Indians in the west who use and have for centuries used peyote in connection with religious services. It is my understanding that they enjoy an exemption under the current law.
>
> My question is whether any of the bills we have before us, if passed, would in any way affect this present exemption?
>
> Mr. Ingersoll. Mr. Sonnenreich [Deputy Chief Counsel of BNDD] has just conducted a hearing on that subject and if you will permit him, I would like him to respond to that.
>
> Mr. Satterfield. Yes.
>
> Mr. Sonnenreich. In the first instance, Mr. Satterfield, the Native American Church did ask us by letter as to whether or not the regulation, exempting them by regulation, would be continued and we assured them that it would because of the history of the church. We presently are involved in another hearing regarding another church that is a non-Indian church that is seeking the exemption and the order is going to be published, I believe, either

---

[9] That exemption read as follows:

The listing of peyote in this subparagraph does not apply to the nondrug use in bona fide religious ceremonies of the Native American Church; however, persons supplying the product to the Church are required to register and maintain appropriate records of receipts and disbursements of the article.

21 C.F.R. § 166.3., now codified at 21 C.F.R. § 320.3.

[10] Responsibility for enforcing the 1965 Amendments was transferred to the Bureau of Narcotics and Dangerous Drugs by Reorganization Plan No. 1 of 1968.

[11] *Hearings on H.R. 11701 and H.R. 13743 Before the Subcomm. on Public Health and Welfare of the House Comm. on Interstate and Foreign Commerce* 117-18 (1970).

today or tomorrow denying them the same exemption as the Native American Church.[12]

We consider the Native American Church to be *sui generis*. The history and tradition of the church is such that there is no question but that they regard peyote as a deity as it were, and we will continue the exemption.

Mr. Satterfield. You do not see anything in the Senate bill that would make this impossible?

Mr. Sonnenreich. No. Under the existing law originally the Congress was going to write in a specific exemption but it was then decided that it would be handled by regulation and we intend to do it the same way under this law.

After the passage of the CSA the Bureau of Narcotics and Dangerous Drugs promulgated the current regulation contained in 21 C.F.R. § 1307.31.[13]

The legislative history supports your agency's existing exemption for the use of peyote in the religious ceremonies of the NAC. In the case of the 1965 Amendments, the House proposed to exempt the *bona fide* religious use of peyote; the Senate dropped the exemption, not because it opposed the religious use of peyote but because it believed that specific reference to peyote would unnecessarily interfere with the discretion which Congress intended to vest in the administrative agency to determine which substances were to be brought under control of the bill. The House accepted the Senate's version only after receiving assurances from the agency which was to administer the statute that the religious use of peyote by the NAC would not be prohibited. Similarly, the CSA was passed against the backdrop of an administrative exemption granted to the NAC under the 1965 Amendments. There was no indication in the legislative history that Congress intended to eliminate the exemption. On the contrary, the House received assurances from the Bureau of Narcotics and Dangerous Drugs that the exemption would be contained under the new statute.

The legislative history could be interpreted to support an exemption only for the NAC, and not for other religious groups. Although the House version of H.R. 2 would have exempted the ceremonial use of peyote by all *bona fide* religious organizations, the House ultimately accepted the Senate version of the 1965 Amendments after receiving

---

[12] The non-Indian church referred to by Mr. Sonnenreich styled itself the "Church of the Awakening." The agency's opinion denying a peyote exemption is published at 35 Fed. Reg. 14789 (1970). The Church of the Awakening challenged this determination in the Ninth Circuit. In *Kennedy* v. *Bureau of Narcotics & Dangerous Drugs*, 459 F.2d 415 (9th Cir. 1972), *cert. denied*, 409 U.S. 1115 (1973), the court accepted the argument that an exemption limited to the NAC was unconstitutional, but declined to extend the exemption to the Church of the Awakening because that group had sought an exemption only for itself and not for all religious users of peyote.

[13] Your agency has succeeded to the responsibility for enforcing the CSA previously exercised by the Bureau of Narcotics and Dangerous Drugs.

assurances which had specific reference only to the NAC. Similarly, the administrative exemption in effect at the time the CSA was passed applied only to the NAC. Officials of the Bureau of Narcotics and Dangerous Drugs informed the Congress of this fact, of the fact that they were about to deny an exemption to a non-Indian church, and of their opinion that the NAC was "sui generis." These officials strongly emphasized what they believed to be the unique history and tradition of the NAC as a peyote-using religion. Thus, it would be reasonable to interpret the legislative history as reflecting a congressional intent to "grandfather" the NAC, because of its special historical status, but not to create any broader exemption.

The two federal courts which have interpreted the exemption, however, have arrived at a broader interpretation. In *Native American Church of New York* v. *United States,* 468 F. Supp. 1247 (S.D.N.Y. 1979) *aff'd mem.* 633 F. 2d 205 (2d Cir. 1980), a primarily non-Indian organization [14] sought a declaration that it had a right to use a variety of "psychedelic" substances, including peyote, for religious ceremonies. After examining the legislative history recounted above, the court held that the statutory exemption was available to *bona fide* religious organizations other than the NAC which use peyote for sacramental purposes and which regard the substance as a deity. [15] This holding was accepted and endorsed in a subsequent district court decision, *Lamantia* v. *Civiletti,* No. 80 Civ. 1534 (RLC) (S.D.N.Y. 1981). [16] In addition to these cases, the Ninth Circuit has held, as we discuss in greater detail below, that an exemption limited to the NAC which excluded other *bona fide* religious organizations would be unconstitutional. *Kennedy* v. *Bureau of Narcotics & Dangerous Drugs,* 459 F. 2d 415 (9th Cir. 1972), *cert. denied,* 409 U.S. 1115 (1973).

On balance, and in light of these cases, we are persuaded that the statutory exemption cannot be restricted in scope to the NAC. On the other hand, the legislative history does not support any broad exemption for the non-Indian use of peyote. In our view, the CSA exempts the religious use of peyote by the NAC and by other *bona fide* peyote-using religions in which the actual use of peyote is central to established religious beliefs, practices, dogmas, or rituals. As a practical matter, no group of which we are aware other than the NAC would meet this demanding standard.

---

[14] The Native American Church of New York was not affiliated with the NAC notwithstanding the similarity of its name.

[15] At trial, however, the court concluded that the Native American Church of New York was not a *bona fide* religion and dismissed the case.

[16] The *Lamantia* case is currently awaiting trial in the Southern District of New York [Note: After trial in this case, the court found that the statutory exemption was not available to the plaintiffs because they were not part of a *bona fide* religious organization. *Birnbaum* v. *United States,* 80 Civ. 1534 (RLC) (S.D.N.Y. April 11, 1983) (unreported opinion) (Carter, J.) Ed.]

The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." The Establishment Clause generally prohibits the government from granting certain preferences to religions or religious adherents which are not available to secular organizations or nonreligious individuals. *E.g., Everson* v. *Board of Education,* 330 U.S. 1 (1947). Because the exemption for the *bona fide* religious use of peyote is arguably a preference granted to religion, the question arises whether the exemption violates the Establishment Clause. There could be no Establishment Clause violation if the NAC has a constitutional right under the Free Exercise Clause to use peyote for ceremonial purposes, notwithstanding the fact that nonreligious groups or individuals are prohibited from using the substance. *Wisconsin* v. *Yoder,* 406 U.S. 205, 234–35 n.22 (1972); *Sherbert* v. *Verner,* 374 U.S. 398, 409–10 (1963). Thus, we first consider whether the NAC has a constitutional right to use peyote for religious purposes. Second, we examine whether the exemption might be constitutional even if a right to the religious use of peyote is not guaranteed by the Free Exercise Clause.

## A. Free Exercise Clause

The Supreme Court has recognized repeatedly that the Free Exercise Clause sometimes requires government to make special accommodations to the needs of religious individuals which are not made for the public at large.

*Sherbert* v. *Verner,* 374 U.S. 398 (1963), the leading case, involved a Seventh-day Adventist who was discharged from her employment for refusing to work on Saturday, her Sabbath. She was denied state unemployment benefits on the ground that her refusal to work on Saturdays rendered her ineligible. The Supreme Court observed that the State's action in effect penalized the exercise of her religion:

> The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* at 404. Because this burden on free exercise values was not justified by a compelling state interest, the Court held that the appellant had been unconstitutionally denied the unemployment compensation.

In *Wisconsin* v. *Yoder,* 406 U.S. 205 (1972), the Court held that a state could not constitutionally impose criminal punishment on Amish parents who removed their children from school after the eighth grade.

Application of the state's compulsory school attendance law was found to burden the exercise of the Amish religion by exposing children to worldly influences and interfering with their integration into a way of life that was inseparably intertwined with the Amish faith.

Finally, in *Thomas v. Review Board*, 450 U.S. 707 (1981), the Supreme Court struck down a state's action in denying unemployment benefits to a Jehovah's Witness who, believing that his religion prohibited participation in the making of armaments, quit his job after being transferred to a department manufacturing military equipment. The Court's analysis reaffirmed the reasoning in *Sherbert v. Verner, supra.* [17]

Attempts to invoke the principle of these cases as a defense against drug charges have generally been unsuccessful. [18] The federal courts have never addressed the question of whether the *Sherbert* principle requires that the NAC be exempted from the general prohibition on peyote use. [19] The early case of *State v. Big Sheep*, 75 Mont. 219, 243 P.

---

[17] The Supreme Court addressed a related question in *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U S. 640 (1981). In that case, a religious organization challenged the constitutionality of a state requirement that it distribute and sell religious literature and solicit donations at a state fair only at an assigned location within the fairgrounds. The Court held that the challenged regulation was a reasonable time, place, and manner restriction of speech. The organization apparently did not argue before the Supreme Court that its peripatetic solicitation—known as the "sankirtan"—was itself a religious practice protected by the Free Exercise Clause. The Supreme Court did not determine whether an otherwise reasonable time, place, and manner restriction could survive scrutiny under the Free Exercise Clause if a religious organization could establish that access to the forum in ways prohibited by the state regulation was central to its religious doctrine and practice. *Compare International Society for Krishna Consciousness, Inc.* v. *Barber*, 650 F. 2d 430. (2d Cir. 1981) (prohibition of peripatetic solicitation at state fair invalidated as unconstitutional burden on free exercise right to practice sankirtan; case was decided prior to *Heffron.*)

The Court may provide more guidance on the extent of accommodation required by the Free Exercise Clause this Term when it decides *United States* v. *Lee, prob. jurisdiction noted*, 450 U.S. 993 (1981). The district court in that case held that the Free Exercise Clause prohibited the government from requiring a member of the Old Order Amish religion to pay certain social security and unemployment insurance taxes, since the Amish religion considers it a sin to pay for or accept any form of social insurance outside of the self-sufficient Amish community. 497 F. Supp. 180 (W.D. Pa. 1980). The United States has taken a direct appeal to the Supreme Court. [NOTE: The Supreme Court reversed the district court, holding that the broad public interest in maintaining a sound tax system outweighed the Amish employer's conscientious objection to paying the tax: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States* v. *Lee*, 455 U.S. 252, 261 (1982). Ed.]

[18] *See, e.g.*, *United States* v *Spears*, 443 F.2d 895 (5th Cir. 1971) (marijuana, heroin, and peyote), *cert. denied*, 404 U.S. 1020 (1972); *United States* v. *Hudson*, 431 F.2d 468 (5th Cir 1970) (heroin and marijuana), *cert. denied*, 400 U.S. 1011 (1971); *Leary* v. *United States*, 383 F.2d 851 (5th Cir. 1967) (marijuana), *rev'd on other grounds*, 395 U.S. 6 (1969); *Randall* v. *Wyrick*, 441 F. Supp. 312 (W D. Mo. 1977) (marijuana and LSD); *United States* v *Kuch*, 288 F. Supp. 439 (D.D.C 1968) (LSD); *People* v. *Mullins*, 50 Cal. App. 3d 61, 123 Cal. Rptr. 201 (1975) (marijuana); *Town* v. *State ex rel. Reno*, 377 So 2d 648 (Fla. 1979) (marijuana), *app. dismissed and cert. denied*, 449 U.S. 803 (1980); *State* v. *Brashear*, 593 P.2d 63, 92 N.M. 622 (1979) (marijuana); *Lewellyn* v. *State*, 489 P.2d 511 (Okl. Cr. 1971) (marijuana); *Gaskin* v. *State*, 490 S.W.2d 521 (Tenn.) (marijuana), *app. dismissed*, 414 U.S. 886 (1973); Annot., *Free Exercise of Religion as Defense to Prosecution for Narcotic or Psychedelic Drug Offense*, 35 A.L.R. 3d 939 (1971).

[19] *But cf. Leary* v. *United States, supra* (leaving question open); *Golden Eagle* v. *Johnson*, 493 F.2d 1179 (9th Cir. 1974) (holding that special procedural safeguards were not required before peyote could be seized from NAC member), *cert. denied*, 419 U.S. 1105 (1975); *Oliver* v. *Udall*, 306 F.2d 819 (D.C. Cir 1962) (refusing to invalidate tribal ordinance prohibiting peyote use), *cert. denied*, 372 U.S 908 (1963); *Native American Church* v. *Navajo Tribal Council*, 272 F.2d 131 (10th Cir. 1959) (same); *Native American Church of Navajoland, Inc.* v. *Arizona Corp. Comm'n*, 329 F. Supp. 907 (D. Ariz. 1971) (upholding refusal to grant incorporation to peyote-using church), *aff'd*, 405 U.S. 901 (1972).

411

1067 (1926), upheld the conviction of an NAC member under state law. But in *People v. Woody, supra,* the California Supreme Court held that the state could not, consistently with the First and Fourteenth Amendments, convict an NAC member for using peyote in religious observances. The court found that the state's interest in enforcing the statute against church members did not outweigh the "virtual inhibition of the practice of defendant's religion" which would have resulted from enforcement. *Woody* has been followed by two other state courts. *Whitehorn v. State,* 561 P.2d 539 (Okl. CR. 1977); *Arizona v. Whittingham,* 19 Ariz. App. 27, 504 P.2d 950 (1973), *cert. denied,* 417 U.S. 946 (1974). *Contra, State v. Soto,* 21 Or. App. 794, 537 P.2d 142 (Or. App. 1975), *cert. denied,* 424 U.S. 955 (1976). At least two states have enacted statutes exempting NAC peyote use from state prohibitions. Montana Stat. 94–35–123; New Mexico Stat. 54–5–16. Montana's statute, which legislatively overruled *State v. Big Sheep, supra,* was upheld in *State ex rel. Offerdahl v. District Court,* 156 Mont. 432, 481 P.2d 338 (1971).[20]

These cases and statutes raise a possibility that the sacramental use of peyote by NAC members is protected by the Free Exercise Clause against the prohibitions of the CSA. Since there are no federal cases on point, however, we examine whether Congress could constitutionally prohibit sacramental peyote use by NAC members.

### 1. Is the NAC a "religion"?

The NAC is unquestionably a "religion" for First Amendment Free Exercise Clause purposes.[21] Although the NAC has no written scriptures or officially promulgated doctrine, its adherents share beliefs in powers, spirits (including God, the "great spirit"), and material incarnations.[22] Members of the NAC follow an ethical code, known as the "Peyote Road," which teaches brotherly love, care of the family, self-reliance, and avoidance of alcohol. NAC members attend all-night rituals known as "peyote meetings," which are solemn events governed

---

[20] *See generally Whitehorn v. State: Peyote and Religious Freedom in Oklahoma,* 5 Am.l. L. Rev 229 (1977); Note, *Native Americans and the Free Exercise Clause,* 28 Hastings L.J. 1509 (1977).

[21] Courts may not inquire into the truth or falsity of religious beliefs, *United States v. Ballard,* 322 U.S. 78 (1944), and are generally reluctant to decide a case on the ground that a given system of belief and action is not a "religion." *But see Yoder,* 406 U.S. at 215–16 ("[a]lthough a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests"); *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430; (worship of Krishna is religion); *Childs v. Duckworth,* 509 F. Supp. 1254 (N.D. Ind. 1981) ("Church of Satan, Fraternity of the Goat" probably not a religion); *Theriault v. Silber,* 453 F. Supp. 254 (W.D. Tex. 1978), *app. dismissed,* 579 F.2d 302 (5th Cir. 1978), *cert. denied,* 440 U.S. 917 (1979) ("Church of the New Song" not a religion); *United States v. Kuch,* 288 F. Supp. 439 (D.D.C. 1968) ("Neo-American Church" not a religion).

[22] For detailed descriptions of the NAC and its rituals, *see, e.g.,* D. Aberle, The Peyote Religion Among the Navajo (1966); W. La Barre, The Peyote Cult (1969); A. Marriott & C. Rachlin, Peyote (1971); V. Petrullo, The Diabolic Root (1934); J. Slotkin, The Peyote Religion (1956).

by elaborate customs regarding the placement and purification of sacred objects, the order of ceremonial activities, and the like.

Given these well-known characteristics, it appears that the beliefs of NAC members satisfy a functional definition of religion: these beliefs occupy a place in the lives of NAC members parallel to that filled in the lives of others by more familiar religions.[23] Indeed, the NAC would qualify as a religion even under a more traditional definition. The NAC displays "a belief in a Supreme Being, a religious discipline, a ritual [and] tenets to guide one's daily existence." *Kuch*, 288 F. Supp. at 444. We conclude, therefore, that the NAC is a "religion" for purposes of the Free Exercise Clause.

## 2. Is peyote use grounded in the history of the NAC?

Courts have accorded great weight to the fact that a given system of belief and action is "not merely a personal preference but . . . has an institutional quality about it."[24] The institutional nature of belief encompasses the notions that a belief is shared with others and that the institution itself has endured for an appreciable period of time.[25] The NAC is an institutional religion in this sense. Its beliefs are shared by large numbers of Indians, including members of many different tribes. A reference to the religious use of peyote in Mexico appears in Spanish historical sources as early as 1560. *People* v. *Woody, supra.* Its doctrine and ritual developed among the Plains Indians sometime between 1870 and 1885; the essential elements of the ritual were well established when first observed by white men in 1897. The NAC was incorporated in Oklahoma in 1921 and is now an international organization with affiliated branches in other states and Canada. The fact that the NAC is an established religion with a significant history of sacramental peyote use is highly relevant to a determination whether the use of peyote by NAC members is protected by the Free Exercise Clause.

---

[23] *See International Society for Krishna Consciousness, Inc.* v. *Barber*, 650 F.2d at 440 (matter of ultimate concern to the individual, such that he would categorically disregard his self-interest in preference to transgressing these beliefs, is his religion); L. Tribe, American Constitutional Law, ch. 14 (1978); Note, *Toward a Constitutional Definition of Religion*, 91 Harv L. Rev. 1056 (1978). *Cf. United States* v. *Seeger*, 380 U.S. 163, 166 (1965) (interpreting statutory draft exemption); *Welsh* v. *United States*, 398 U.S. 33 (1970) (same); *Malnak* v. *Yogi*, 592 F.2d 197 (3d Cir. 1979) (Transcendental Meditation is a religion for Establishment Clause purposes).

[24] *Brown* v. *Dade Christian School Inc.*, 556 F.2d 310 (5th Cir. 1977), *cert. denied*, 434 U S. 1063 (1978). *Accord, Yoder*, 406 U.S. at 216 (Thoreau's decision to move to Walden Pond was based on beliefs which were "philosophical and personal rather than religious, and such belief does not rise to the demands of the religion clauses.")

[25] *See, e.g., Yoder*, 406 U.S. at 235 ("history of three centuries as a religious sect and a long history as a successful and self-sufficient segment of American society").

### 3. Is peyote use central to the NAC?

Courts tend to require convincing governmental interests to justify burdening practices that are central to a given religion.[26] It seems indisputable that the use of peyote is central to the NAC in this sense. Peyote lies at the "theological heart" of the NAC. *People* v. *Woody, supra,* 61 Cal. 2d at 722, 40 Cal. Rptr. at 74, 394 P.2d at 818. Some NAC members believe in a divine "Peyote Spirit." All NAC members apparently believe that peyote is the material incarnation of spiritual power. Moreover, taking of peyote is the very cornerstone of the peyote meeting. It is not an exaggeration to say that use of peyote is the *sine qua non* of the NAC. *See, generally, id.;* sources cited in n.22, *supra.*

### 4. Is prohibiting religious peyote use the least restrictive means of accomplishing a compelling governmental purpose?

Because peyote use is firmly grounded in the NAC's history and central to its doctrine and ritual, it can be prohibited only if such a restriction is the least restrictive means of achieving a compelling governmental purpose. We can imagine three possible interests that the federal government might assert: (1) the interest in preventing harm to the NAC member resulting from peyote use in religious ceremonies; (2) the interest in preventing abuse of peyote by nonreligious persons who falsely claim to be religious; and (3) the interest in encouraging compliance with the law by other persons who do not claim the religious exemption, but who might doubt the public health justification if certain groups were exempted for whatever reason. We think it likely that these interests would be considered compelling in the context of *bona fide* sacramental use of peyote, and that a prohibition backed by civil and criminal sanctions is the least restrictive means of achieving the objective. As noted in note 18 *supra,* the majority of cases have recognized that the government has a compelling interest in prohibiting drug usage even by persons who take drugs for religious purposes. However, we lack sufficient facts to make a conclusive judgment in this regard.

Peyote is harmful to those who ingest it. This conclusion is implicit in the decision of Congress to list peyote as a Schedule I controlled substance in the CSA. Peyote is known to contain toxic alkaloids that can be lethal if taken in sufficient quantity, although there is no known lethal dosage of peyote itself. Mescaline, the major active ingredient in

---

[26] *See Yoder,* 406 U.S. at 210, 216, 218, 221, 235 (objection to formal education beyond eighth grade was "firmly grounded in . . . central religious concepts", separation from worldly community was "fundamental," "basic," and "vital" to the faith); *Frank* v. *Alaska,* 604 P.2d 1068 (Alaska 1979) (reversing poaching conviction of Athabascan Indian who killed a moose for funeral feast; feast was "the most important institution in Athabascan life" and "food is the cornerstone of the ritual"); L. Tribe, *supra,* at §§ 14-11, pp. 859-65. *Compare Sequoyah* v. *TVA* 620 F.2d 1159 (6th Cir.), *cert. denied,* 449 U.S. 953 (1980) (refusing to enjoin construction of Tellico Dam at request of Cherokee Indians who alleged that impoundment would flood sacred tribal sites; not central to tribal religion).

peyote, has been linked to harmful somatic or mutagenic effects. Use of peyote can cause permanent psychological damage in the form of personality disintegration, loss of concentration, memory failure, paranoia, passivity, and depression.[27] However, the government has consistently exempted peyote use by the NAC from the CSA. Its own action in creating and abiding by this exemption may point to the conclusion that its interest in prohibiting religious peyote use is not compelling. *Cf. Metromedia, Inc.* v. *City of San Diego,* 453 U.S. 490 (1981) (plurality opinion) (fact city exempted on-site commercial billboards from general prohibition on billboards undercut city's argument that off-site noncommercial billboards could be prohibited).

The government has a compelling interest in enforcing the general prohibition on nonreligious peyote use. Thus, Congress could determine that an exemption for the NAC would create an intolerable risk that persons would use the cover of false adherence to religion in order to abuse the substance. Congress could also determine that an exemption would encourage disrespect for the law by seemingly undercutting the public health rationale for the prohibition of use by non-NAC members. Again, however, the strength of this argument would possibly be undercut by the government's longstanding exemption for the NAC. We are aware of no evidence that enforcement efforts have been significantly handicapped by the exemption.

In summary, we think it likely that Congress could, consistently with the Free Exercise Clause, prohibit even the religious use of peyote if it chose to do so, but we are unable to answer this question with assurance because we lack sufficient facts on which to make that judgment. For example, it would be useful to know whether peyote has the same type of harmful effects when used in religious ceremonies as when taken in clinical tests, and how NAC members compare with other Indians with respect to their overall physical and emotional health. Evidence of whether the peyote exemption has hampered enforcement efforts could also be relevant.

## B. Establishment Clause

Because we are unable to conclude with confidence that the NAC has a free exercise right to use peyote for religious purposes, we now consider whether the exemption for the religious use of peyote contained in the CSA would offend the Establishment Clause if it is not required by the Free Exercise Clause. Under the Establishment Clause, government aid or preference to religion is constitutional only if it satisfies each part of a three-prong test: (1) it must have a secular purpose; (2) it must have a primary effect which neither aids nor

---

[27] *See, generally,* 35 Fed. Reg. 14790–91 (1970). However, to our knowledge peyote has never been shown to be addictive.

inhibits religion; and (3) its application must not result in excessive entanglement of government with religion. *Stone* v. *Graham,* 449 U.S. 39 (1980) *(per curiam)*; *Wolman* v. *Walter,* 433 U.S. 229, 236 (1977); *Meek* v. *Pittenger,* 421 U.S. 349, 358 (1975); *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U.S. 756, 773 (1973).

The Supreme Court has on several occasions upheld against Establishment Clause challenges state actions which provided a special accommodation for religion. In *Zorach* v. *Clawson,* 343 U.S. 306 (1952), the Court upheld a program in which children were allowed to leave the public schools at a designated time in order to receive religious instruction elsewhere. The Court held that this accommodation to religious needs by secular authorities was not an unwarranted departure from the neutrality required by the Establishment Clause:

> When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.

*Id.* at 313–14.

In *Walz* v. *Tax Commission of New York,* 397 U.S. 664 (1970), the Court upheld a state tax exemption for properties held by charitable, educational, and religious organizations, including properties used solely for religious worship. The Court observed that "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." 397 U.S. at 668. Although the state's obligation was one of neutrality, strict neutrality was not possible:

> The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of these expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference . . . . The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.

397 U.S. at 669, 673. Stressing that the exemption applied to charitable and educational institutions as well as religious ones, the Court found that it was not enacted with a religious purpose. Moreover, enforcing a tax against religious property would involve the state in greater entan-

glement with religion than would granting an exemption. Finally, the Court stressed the long and uninterrupted history of property tax exemptions for churches in this country. As the Court stated with respect to this historical practice:

> It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it. Yet an unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something lightly to be cast aside.

397 U.S. at 678.[28]

Because they did not address whether the exemptions in question were required by the Free Exercise Clause, these cases do not expressly hold that the government may constitutionally accommodate religion by granting it special benefits not mandated by the Constitution. The failure of the Court to decide the cases on Free Exercise Clause grounds, however, may indicate that the released time program in *Zorach* or the tax exemption in *Walz* were not constitutionally required. Certainly, the Court's language quoted above from *Walz* implies that such an accommodation could be constitutional at least in some cases.[29]

---

[28] *See also Sherbert,* 374 U.S. at 422, (Harlan, J., dissenting, joined by White, J.). These Justices dissented from the Court's conclusion that an exemption for Seventh-day Adventists was required by the Free Exercise Clause, but nevertheless contended that the state of its own volition could provide such an exemption without violating the Establishment Clause:

> [A]t least under the circumstances of this case it would be a permissible accommodation of religion for the State, if it *chose* to do so, to create an exception to its eligibility requirements for persons like the appellant. The constitutional obligation of "neutrality" . . is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation.

*Compare Widmar* v. *Vincent,* 454 U.S. 263, 273 n.13 (1981) (Court declined to "reach the questions that would arise if State accommodation of Free Exercise and Free Speech rights should, in a particular case, conflict with the prohibitions of the Establishment Clause"); *id.* at 282 (White, J., dissenting):

> I have long argued that Establishment Clause limits on state action which incidentally aids religion are not as strict as the Court has held. The step from the permissible to the necessary, however, is a long one. In my view, just as there is room under the Religion Clauses for state policies that may have some beneficial effect on religion, there is also room for state policies that may incidentally burden religion. In other words, I believe the States to be a good deal freer to formulate policies that affect religion in divergent ways than does the majority.

[29] The lower federal courts have addressed a closely analogous problem in the context of challenges to § 701(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(j), which requires employers reasonably to accommodate the religious beliefs and practices of their employees. The courts have split on whether the reasonable accommodation provision violates the Establishment Clause. Courts in the Fourth, Sixth, Seventh, and Ninth Circuits have upheld § 701(j). *Jordan* v *North Carolina Nat'l Bank,* 399 F. Supp. 172 (W.D N.C. 1975), *rev'd on other grounds,* 565 F.2d 72 (4th Cir. 1977); *Cummins* v. *Parker Seal Co.,* 516 F.2d 544 (6th Cir. 1975), *aff'd by an equally divided Court,* 429 U.S. 65 (1976); *Nottelson* v. *Smith Steel Workers D.A.L.V. 19806,* 643 F 2d 445 (7th Cir.), *cert. denied,* 454 U.S. 1046 (1981); *Tooley* v. *Martin-Marietta Corp.* 648 F.2d 1239 (9th Cir. 1981). Courts in the Third and Fifth Circuits have struck it down *Gavin* v. *People Natural Gas Co.,* 464 F. Supp 622 (W.D. Pa. 1979); *Isaac* v. *Butler's Shoe Corp.,* 511 F. Supp. 108 (N.D. Ga. 1980). Commentators are likewise divided: *e.g.,* Wheeler, *Establishment Clause Neutrality and the Reasonable Accommodation Requirement,* 4 Hastings L.Q. 901 (1977) (valid); Note, *Can the Government Require Accommodation of Religion at the Private Job-Site?,* 62 Va. L. Rev. 237 (1976) (invalid). The Supreme Court has failed to resolve the
Continued

417

While the lack of a clear holding in these cases cautions against any firm statement of the legal principles in this area, it is our opinion that the government may, consistently with the Establishment Clause, take actions necessary to avoid substantial interference with religious practices or beliefs, even if such actions are not required by the Free Exercise Clause, provided that the actions do not impose hardship on others or amount to government sponsorship or support of religion. Such a rule would comport with the practical necessities of government. The Framers of the Constitution could not have intended that there be precisely one and only one correct course of action between committing a Free Exercise Clause violation, on the one hand, and an Establishment Clause violation, on the other. The government must enjoy a zone of permissible accommodation if it is to function at all. *See Walz*, 397 U.S. at 673. *Cf.* Linde, *Due Process of Lawmaking*, 55 Neb. L. Rev. 197 (1976).

Applying this principle to the problem at hand, we conclude that the CSA's exemption for the *bona fide* religious use of peyote passes muster under the Establishment Clause. As noted above, this exemption might be required by the Free Exercise Clause, although we believe it more likely that the exemption is not constitutionally mandated. Even if not required by the Free Exercise Clause, such an exemption appears necessary to avoid substantial interference with the religious practices and beliefs of the NAC. The exemption would not impose affirmative burdens on any person, believer or nonbeliever, nor would it amount to government sponsorship or support of religion.

The exemption should not be viewed as having a religious purpose: your agency's goal is not specifically to further the interests of the NAC or any other religion, but, rather, to meet its possible obligations under the Free Exercise Clause and, more generally, to further free exercise values by removing affirmative barriers to religious practices. Nor does the exemption have a primarily religious effect: encouraging freedom of religious belief and practice evinces only a "benevolent neutrality" in matters of religion. *Walz*, 397 U.S. at 669. In exempting sacramental peyote use based on the importance and history of such use, the government does not lend its imprimatur to any particular religion or religion in general, nor does it encourage belief in the tenets of any religion. There is no "sponsorship, financial support, [or] active involvement of the sovereign in religious activity." *Id.* at 668. Finally,

---

issue, although it has evinced interest in it. In *Dewey* v. *Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970), the circuit court considered EEOC regulations which were the predecessor of §701(j); the Supreme Court affirmed by an equally divided vote, 402 U.S. 689 (1971). The Supreme Court also affirmed *Cummins* v. *Parker Seal Co., supra,* by an equally divided vote, 429 U.S. 65 (1976) (Stevens, J., not participating) In *TWA* v. *Hardison,* 432 U S 63 (1977), the Court did not reach the issue since it held that no accommodation was reasonably possible

*See also Jaggard* v. *Commissioner,* 582 F.2d 1189 (8th Cir. 1978), *cert. denied,* 440 U.S. 913 (1979) (upholding social security tax exemption for persons with religious scruples against accepting benefits of insurance schemes).

an exemption for the sacramental use of peyote would probably not be invalidated as entailing an impermissible government entanglement in religious matters. Reliance on history as an important probative factor should reduce the entanglement that might otherwise accompany a governmental investigation of whether a system of belief and action is a religion, whether the adherent is sincere, and whether peyote use is central to the religion.

We conclude, therefore, that the Establishment Clause is not violated by the statutory exemption for the religious use of peyote by the NAC and other *bona fide* peyote-using religions in which the actual use of peyote is central to established religious beliefs, practices, dogmas, or rituals.

### III. Availability of Exemption

Finally, you have inquired as to the constitutionality of exempting American Indian peyotists to the exclusion of other religious users of peyote. Such an exemption would require statutory amendment, since, as we concluded in Part I, the current statutory exemption applies to the NAC and to other religions whose use of peyote is central to established religious beliefs, practices, dogmas, or rituals. We conclude that an exemption limited to American Indians might well be unconstitutional.

It is well accepted that the Establishment Clause prohibits a government from "prefer[ring] one religion over another." *Everson*, 330 U.S. at 15. *See Cruz* v. *Beto*, 405 U.S. 319 (1972) (prison must provide reasonable opportunity for Buddhist to pursue faith comparable to that provided prisoners of other religions); *Fowler* v. *Rhode Island*, 345 U.S. 67 (1953) (Jehovah's Witness meeting may not be barred in public park open to other religious services).[30] Under accepted principles, therefore, an exemption which discriminates among otherwise equally situated religions violates the Establishment Clause.

We do not believe that any different conclusion is required when, as here, the "preferred" religion is comprised of American Indians. It is true that Indians are treated differently for some purposes under our law. Special rules of construction govern judicial interpretation of statutes and treaties involving Indians. Indians may be given preference on the basis of tribal membership without triggering heightened equal protection scrutiny. *Morton* v. *Mancarci*, 417 U.S. 535 (1974). Indian tribes may establish a religion on the reservation without contravening constitutional or statutory prohibitions. *See Talton* v. *Mayes*, 163 U.S. 376 (1896); Indian Civil Rights Act, 25 U.S.C. § 1302. Congress has

---

[30] *See also Valente* v. *Larson*, 637 F 2d 562 (8th Cir. 1981) (exemption from solicitation ordinance which applied unequally to different religious organizations held to violate Establishment Clause), *cert. granted*, 49 U.S.L.W. 3890 (1981) [*aff'd* 456 U.S. 228 (1982)].

shown special concern for Indian religion by enacting the Indian Religious Freedom Act of 1978, Pub. L. No. 95–341.

However, the special treatment of Indians under our law does not stem from the unique features of Indian religion or culture. With respect to these matters, Indians stand on no different footing than do other minorities in our pluralistic society. Rather, the special treatment of Indians is grounded in their unique status as political entities, formerly sovereign nations preexisting the Constitution, which still retain a measure of inherent sovereignty over their peoples unless divested by federal statute or by necessary implication of their dependent status. *See United States* v. *Wheeler*, 435 U.S. 313 (1978).

An exemption for Indian religious use of peyote would not be grounded in the unique political status of Indians. Instead, the exemption would be based on the special culture and religion of the Indians. In this respect, Indian religion cannot be treated differently than other religions similarly situated without violation of the Establishment Clause.[31]

Our conclusion in this respect is consistent with the relevant court decisions. *In re Grady,* 61 Cal. 2d 887, 394 P.2d 728, 39 Cal. Rptr. 912 (1964), was a habeas corpus petition brought by a self-styled "peyote preacher" who had been convicted of illegal possession of peyote. The California Supreme Court granted the writ and remanded for a hearing on the authority of *People* v. *Woody, supra.* The court apparently believed it irrelevant whether the petitioner was an Indian or a member of the NAC. *Kennedy* v. *Bureau of Narcotics and Dangerous Drugs, supra,* 459 F.2d 415, was a petition for review of a refusal by the predecessor of your agency to amend the peyote exemption to include a group styling itself as the "Church of the Awakening." The court held that an exemption restricted to members of the NAC "creates an arbitrary classification that cannot withstand substantive due process attack." *Id.* at 417.[32]

### IV. Conclusion

The possible necessity of extending the exemption to other non-Indian groups may entail some additional administrative burdens for your agency. As a practical matter, however, we believe that no other groups of which we are aware could establish their entitlement to the exemption. We believe that your agency would be fully justified in

---

[31] The Department of Justice has expressed similar views in another context. *See generally* Statement of Larry L. Simms on S.J. Res. 102 before the Senate Select Committee on Indian Affairs, February 27, 1978 (noting that congressional preference for Indian over non-Indian religions could raise Establishment Clause problems).

[32] However, the court declined to grant relief: since the Church of the Awakening had sought to include only itself within the exemption while leaving other *bona fide* religions nonexempt, the requested exemption was subject to the same constitutional infirmity as was an exemption limited to the NAC.

adopting procedures or standards designed to minimize those burdens wherever possible. Such procedures or standards would probably be supported by one or more of three compelling governmental interests: (1) the interest in avoiding excessive administrative burdens; (2) the interest in preventing abuse of peyote by persons falsely claiming a religious exemption; and (3) the interest in avoiding unnecessary entanglement with religion.

Your agency could require that any group wishing to qualify for the exemption bring a petition for inclusion. If such a petition is brought, your agency could: (1) require that the petitioner be a member of a *bona fide* peyote-using religion in which the actual use of peytoe is central to established religious beliefs, practices, dogmas, or rituals; and (2) apply a rebuttable presumption that the exemption is not available, under the foregoing standard, unless the petitioner can allege and establish a significant history of religious use of peyote. Such a presumption is justifiable as an objective means of determining that the petitioner's beliefs are *bona fide* and religious. While a purely personal and idiosyncratic religion may be theoretically possible, *cf. United States* v. *Seeger,* 380 U.S. 163 (1965), the Supreme Court has stressed the importance of a recognized and established organization, with a significant history of the religious practice in question, to a determination that given beliefs and practices are religious. A requirement that the petitioner be a member of an established organization with a significant history of peyote use would serve to relieve the administrative burden on your agency. Moreover, it would deter false petitions by individuals who wish to abuse peyote for nonreligious purposes. Finally, this type of requirement may be necessary to prevent undue entanglement by your agency in religious matters.

Our research has identified no religious organizations, other than the NAC, which would qualify for the exemption under these or similar procedural and substantive requirements. It seems unlikely, therefore, that in practice the peyote exemption need be expanded beyond an exemption for the NAC. If, however, a group does appear which can establish that it is a *bona fide* religion in which the actual use of peyote is central to established religious beliefs, practices, dogmas, or rituals, your agency is obligated to accord it the exemption under the current statutory scheme.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*