504 P.2d 950

**STATE of Arizona, Appellee,**

v.

**Janice WHITTINGHAM and Greg Whittingham, Appellants.**

**No. I CA–CR 443.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 9, 1973.

Rehearing Denied Feb. 27, 1973.

Review Granted April 3, 1973.

Gary K. Nelson, Atty. Gen. by James R. Redpath and Roderick G. McDougall, Asst. Attys. Gen., Phoenix, for appellee.

Mangum, Wall & Stoops by Richard K. Mangum, Flagstaff, for appellants.

DONOFRIO, Presiding Judge.

Appellants were convicted of a violation of A.R.S. § 36–1061, possession of peyote, a misdemeanor. They appealed, seeking a determination from this Court as to whether their convictions violated the First Amendment of the United States Constitution which guarantees the free exercise of freedom of religion. The charges, subsequent arrest, and convictions stem from a raid led by undercover agents of the Department of Public Safety on a hogan located at Parks, Arizona, in Coconino County on October 18, 1969 in which the defendants-appellants were present and admitted ingesting peyote in a milieu which they allege was a bona fide ceremony in a Native American Church convened for the purpose of blessing their marriage.

At the conclusion of a lengthy Superior Court trial the judge, as trier of fact, took the matter under advisement and subsequently, on May 24, 1971, issued a mem-

orandum opinion adjudging the guilt of the defendants. We are taking the liberty of quoting in *haec verba* from the trial judge's memorandum opinion as it sets out quite succinctly the facts he determined:

"On October 18, 1969 a group of over forty people, some of whom appeared to be Indians and others non-Indians, gathered together in a building on the property of one Andrew Scott situated in the Town of Parks, Coconino County, Arizona in an area not within the boundaries of an Indian Reservation. The purpose of the meeting was to perform a religious ceremony to bless the marriages of the defendants Janice Whittingham and Greg Whittingham and another couple. The couples had been previously married in civil proceedings in the State of California. Although neither Mr. or Mrs. Whittingham appeared to be of Indian descent, Mrs. Whittingham testified, without rebuttal, that her grandfather was a full-blooded Blackfoot Indian.

"During the ceremony at Parks, police officers arrested those present, including the Defendants Whittingham, who were subsequently charged with having violated Section 13–1061 [36–1061], Arizona Revised Statutes, which prohibits the possession of peyote.

"The defendants defend primarily upon the ground that at the time of their arrest they were engaged in a bona fide religious ceremony of the Native American Church of Parks, Arizona, and that their activity would thus be protected under the First Amendment to the Constitution of the United States which guarantees religious freedom.

\*     \*     \*     \*     \*     \*

"The Native American Church has always been primarily an 'Indian religion' by reason of its origin and in the context that substantially all of its members are American Indians. However, membership to persons who are not members of Indian Tribes or do not have Indian heritage, is usually not refused.

\*     \*     \*     \*     \*     \*

"A 'meeting' is the proper and accepted designation of a ceremony of the Native American Church, which convenes and continues from sundown to sunrise. A meeting is conducted and presided over by a group of experienced persons (usually Indians) known as a 'Road Crew', led by a 'Road Chief'. Although a meeting is characterized by prayer, singing and the ritualistic use of a drum, fans, an eagle-bone whistle, a rattle and the mutual smoking of hand-rolled cigarettes, by the congregation, the primary and central event consists of the use and ingestion of peyote. *The peyote is, in fact, central and primary to the ceremony. It is considered to be a sacred symbol, or divine plant around which the entire service is organized. The congregation prays to and through the peyote, which is ingested by the members of the congregation in the form of greens, peyote tea, ground buttons and more recently capsules containing the ground substance. A bona fide ceremony cannot take place without the presence of peyote.*

\*     \*     \*     \*     \*     \*

*"The Court finds that the ceremony conducted in October, 1969 at Parks, Arizona substantially followed the recognized form of a service of the Native American Church and was conducted and presided over by a Road Crew and Road Chief who had traveled from the Navajo Indian Reservation for that purpose.*

*"The Court further finds that the purpose of the ceremony was to bless the marriage of the Defendants Whittingham and another couple. Additionally, the Court finds that the Defendants Whittingham were serious and sincere participants in what they considered to be a ceremony having religious significance, which was conducted for the purpose of blessing their marriage.*

*"Finally, the Court finds that during the course of the ceremony the defendants, and each of them, possessed and ingested peyote."* (emphasis supplied)

■ We have reviewed the voluminous record carefully and have determined that the evidence does support the findings set out above. Therefore, given this background, we must answer the appellee's issue presented on appeal, namely, whether the use of peyote in the bona fide pursuit of religious faith was constitutionally protected by the First Amendment of the United States Constitution which is binding upon Arizona. Arizona Constitution, Art. 2, Sec. 3, A.R.S. It is the opinion of the Court that the question raised on appeal must be answered in the affirmative. Therefore the convictions of these defendants must be reversed.

■ It is well settled that the First Amendment right to freedom of religion grants an individual the right to the free exercise of his chosen religion without governmental intervention or interference unless a "compelling state interest" in regulation that is contravening to the religious practice is proven. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); West Va. State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943). In order to reach the issue of a compelling state interest, state regulation must be of the nature and quality so as to preclude or prohibit the free exercise of religion.

In the interest of brevity we have not discussed the historical aspects of Peyotism, botanical information regarding the origins of the peyote plant, or the hierarchy of the Native American Church. The record is saturated with evidence on these subjects.

In analyzing the competing interests of the parties to this action we must emphasize that the record, and the trial court's findings, made several determinations in which Peyotism was found to be an established religion of many centuries' history. Suffice it to say, therefore, that Peyotism is not a twentieth century cult nor a fad subject to extinction at a whim. Most of the members who testified at trial, e. g., were active participants in the Native American Church and had been for years, in fact, in many instances, for decades. The religion is established with a following of several hundred thousand believers.

Perhaps the most cogent proof that the religion is a vibrant force today, and will most likely continue to be, is the fact that the federal government has recognized that Peyotism is a legitimate religious practice and has made an exception for the use of peyote in Peyotist ceremonies on reservations. At the present time several jurisdictions [1] have, by legislative enactment or judicial decree, also permitted the use of peyote for sacramental purposes. It was also established that the use of peyote during a "meeting" is a central force and the theological basis of Peyotism. Peyote constitutes, in and of itself, an object of worship. Without it the sacraments of the Native American Church are obliterated. Therefore, it seems apparent from the record that believers who worship at the Native American Church cannot freely exercise their religious beliefs absent the use of peyote.

The Court must next determine whether there is a substantial threat to public safety, order or peace resulting from the use of peyote. On the basis of the record before the Court, which we highlight below, we believe that the State failed to sustain its burden of proof upon this issue. The Attorney General contended that § 36–1061, A.R.S., possession of peyote, is a reasonable legislative exercise of the police power in that the mescaline contained in peyote can produce hallucinations, delusions and other deleterious effects upon humans. In that regard, at trial both sides made a complete record concerning the effects of peyote. Again, we are fortunate to have the findings of fact by the trial judge on this issue. They are:

"The principal active ingredient in peyote is mescaline, a hallucinogenic drug. When taken internally, peyote can produce temporary hallucinations or what

---

1. New Mexico, Montana and Iowa by statute; California by case decisions, see *infra*.

might be described as bizarre alterations of sensory perception, resembling symptoms of psychotic behavior. These include the observance of kaleidoscopic colors, geometric patterns or scenes depicting people and places.

"In addition to these psychological effects, peyote can cause vomiting by reason of its bitter taste and it is for this reason that the substance is often ground and placed in capsules prior to ingestion.

"In acting upon the central nervous system, peyote can also result in convulsions and ultimately, death. The evidence presented at the time of trial in the within cause did not establish, however, any documented incidents of death or insanity among humans who had ingested peyote. *The plant is properly described as a 'hallucinogen' and is not a narcotic or habit forming substance."* (emphasis added)

The State presented the testimony of Dr. Maurice Seevers, a professor and chairman of the Department of Pharmacology at the University of Michigan, who gave his opinion regarding the deleterious effects of peyote. Dr. Seevers' testimony was based exclusively on unpublished research undertaken approximately sixteen years before trial in which dogs were given dosages of peyote in order to determine what a legal amount of the substance would be. Monkeys were given peyote to determine what amounts were absorbed and to analyze the blood levels obtained from the ingested substance. Evidence was elicited which substantiated the court's findings that many of the dogs convulsed and ultimately died. There were no experiments performed on humans. Dr. Seevers stated that a dog is able to tolerate a dose of peyote approximately 100 times greater than would be tolerable for humans. This "rule of thumb" which Dr. Seevers quoted is a well established pharmacological and toxicological extrapolition factor.

The record presented to this Court, however, is devoid of any evidence of death or convulsions in humans. This is not to say that Dr. Seevers' testimony was incor-

rect or could not ultimately be proved to be correct with reference to the effects of peyote on humans. In essence, the testimony does substantiate the State's contention that the excessive use of peyote might be attended by certain ill effects or damage to humans. However, we take judicial notice of the fact that many products are marketed universally and yet if ingested in unusually large amounts can be harmful, to wit, aspirin and alcohol. The uncontroverted evidence on the record was that peyote is not a narcotic substance and is not habitforming. The fact that the use of peyote will not result in addiction is crucial because the State would have a great interest in protecting its citizens from drug abuse. Had the addictive qualities of peyote been proven, the State's interest would be stronger because of the possible burden upon our resources that an addict can become if the State is forced to assume the maintenance of this individual. Furthermore, the State failed to prove that the quantities of peyote used in the sacraments of the Native American Church are sufficiently harmful to the health and welfare of the participants so as to permit a legitimate intrusion under the State's police power.

The next issue to be resolved is whether there is a compelling State interest in the regulation of peyote, given the facts that the free exercise of the religion would be curtailed and that a substantial threat in the sacramental use of peyote has not been proven. We recognize that the United States Supreme Court has stated:

"In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process

clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect . . ." West Va. State Board of Education v. Barnette, supra, 319 U.S. at 639, 63 S.Ct. at 1186.

We have also been guided by the California Supreme Court's decision in People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), in reaching the legal conclusion that the First Amendment right of freedom of religion clothes these defendants with immunity from prosecution. That case is startlingly similar to the instant one on the facts, in which the State of California had interests similar to those now argued by the Attorney General. The court there reached a legal conclusion identical to the one this Court has reached.

Regarding the State's contention that enforcement would be difficult, and abuse due to fraudulent claims of religious sincerity would reign, we can only reiterate that the record before this Court does not give us pause to doubt the appellants' sincerity.

The California court in Woody was presented with a similar argument, and held that the determination must be made upon a case-to-case basis:

". . . We do not doubt the capacity of judge and jury to distinguish between those who would feign faith in an esoteric religion and those who would honestly follow it. 'Suffice it to say that trial courts will have to determine in each instance, with whatever evidence is at hand, whether or not the assertion of a belief which is protected by the First Amendment is *in fact* a spurious claim.' (In re Jenison, supra, 267 Minn. 136, 125 N.W.2d 588, 590; italics added.) Thus *the court makes a factual examination of the bona fides of the belief and does not intrude into the religious issue at all; it does not determine the nature of the belief but the nature of the defendants' adherence to it."* (emphasis added) 40 Cal.Rptr. at 77, 394 P.2d at 821

The holding in the instant case is based upon what can be considered a rather complete record in which the trial court determined, and we feel correctly so, that the defendants were sincere participants in what appeared to be a meeting of the Native American Church.

Therefore, in a prosecution for an alleged violation of A.R.S. § 36–1061 it is a defense to that prosecution to show that the peyote was being used in connection with a bona fide practice of a religious belief; that it was an integral part of the religious exercise; and that it was used in a manner not dangerous to the public health, safety or morals. See In re Grady, 61 Cal.2d 887, 39 Cal.Rptr. 912, 394 P.2d 728 (1964).

Where sincere participants ingest peyote while taking part in a bona fide religious ceremony, and (as was said by the court in Woody) "the use of peyote incorporates the essence of the religious expression", there is a clear exception from the purview of A.R.S. § 36–1061. The State of Arizona's interest cannot be of such a different quality or nature than those jurisdictions that have acknowledged an exception within their criminal codes for the sacramental use of peyote in a bona fide religious ceremony.

To conclude, in Woody it was stated:

"We know that some will urge that it is more important to subserve the rigorous enforcement of the narcotic laws than to carve out of them an exception for a few believers in a strange faith. They will say that the exception may produce problems of enforcement and that the dictate of the state must over-

come the beliefs of a minority of Indians. But the problems of enforcement here do not inherently differ from those of other situations which call for the detection of fraud. On the other hand, the right to free religious expression embodies a precious heritage of our history. In a mass society, which presses at every point toward conformity, the protection of a self-expression, however unique, of the individual and the group becomes ever more important. The varying currents of the subcultures that flow into the mainstream of our national life give it depth and beauty. . . ." 40 Cal. Rptr. at 77, 394 P.2d at 821

For the aforementioned reasons the judgments of conviction are set aside.

Reversed.

STEVENS and HAIRE, JJ., concur.