**UNITED STATES of America, Plaintiff,**

v.

**Robert Lawrence BOYLL, Defendant.**

**Crim. No. 90–207–JB.**

United States District Court,
D. New Mexico.

Sept. 3, 1991.

**1334**

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M., for defendant.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THERE is a genius to our Constitution. Its genius is that it speaks to the freedoms of the individual. It is this genius that brings the present matter before the Court. More specifically, this matter concerns a freedom that was a natural idea whose genesis was in the Plymouth Charter, and finds its present form in the First Amendment to the United States Constitution—the freedom of religion.

The Government's "war on drugs" has become a wildfire that threatens to consume those fundamental rights of the individual deliberately enshrined in our Constitution. Ironically, as we celebrate the 200th anniversary of the Bill of Rights, the tattered Fourth Amendment right to be free from unreasonable searches and seizures and the now frail Fifth Amendment right against self-incrimination or deprivation of liberty without due process have fallen as casualties in this "war on drugs." It was naive of this Court to hope that this erosion of constitutional protections would stop at the Fourth and Fifth Amendments. But today, the "war" targets one of the most deeply held fundamental rights—the First Amendment right to freely exercise one's religion.

To us in the Southwest, this freedom of religion has singular significance because it affects diverse cultures. It is as much of us as the rain on our hair, the wind on the grass, and the sun on our faces. It is so naturally a part of us that when the joy of this beautiful freedom sings in our souls, we find it hard to conceive that it could ever be imperilled. Yet, today, in this land of bright blue skies and yellow grass, of dusty prairies and beautiful mesas, and vistas of red earth with walls of weathered rock, eroded by oceans of time, the free spirit of the individual once again is threatened by the arrogance of Government.

The issue presented is the recurring conflict between the Native American Church members' right to freely exercise their religion through the ceremonial use of peyote and the Government's efforts to eradicate illegal drugs. To the Government, peyote is a dangerous hallucinogen. To Robert Boyll, peyote is both a sacrament and a deity essential to his religion. But this matter concerns competing interests far greater than those relating to this small, spineless cactus having psychedelic properties. It draws forth a troublesome constitutional conflict which arises from fundamentally different perspectives of peyote.

In its "war" to free our society of the devastating effects of drugs, the Government slights its duty to observe the fundamental freedom of individuals to practice the religion of their choice, regardless of race. Simply put, the Court is faced with the quintessential constitutional conflict between an inalienable right upon which this

country was founded and the response by the Government to the swelling political passions of the day. In this fray, the Court is compelled to halt this menacing attack on our constitutional freedoms.

On May 10, 1990, the Federal Grand Jury indicted Robert Lawrence Boyll, a non-Native American, for unlawfully importing peyote through the United States mail and possessing peyote with the intent to distribute it, in violation of 21 U.S.C. §§ 952(a), 960(b)(3), 843(b) & (c), & 841(a)(1) (1981). The three-count indictment arose out of Mr. Boyll mailing himself a quantity of peyote from Mexico to his home in San Cristobal, New Mexico.

In his motions to dismiss, Mr. Boyll argues that the indictment violates his First Amendment right to freely exercise his religion. Mr. Boyll also claims that, pursuant to 21 C.F.R. § 1307.31 (1990), the listing of peyote as a controlled substance does not apply to him because he is a member of the Native American Church and he imported and possessed peyote for use in bona fide religious ceremonies of the Native American Church.

The United States adopts a racially restrictive reading of 21 C.F.R. § 1307.31, arguing that the protection contained therein applies only to members of the Native American Church who are American Indians. It claims that Mr. Boyll cannot be a member of the Native American Church because "membership is limited to persons who [sic] ethnic descent is at least twenty-five percent derived from American Indian stock, and to the spouses of such persons"; that, therefore, Mr. Boyll cannot be a member of the Native American Church since neither he nor his spouse is twenty-five percent American Indian.

The Court held an evidentiary hearing in this matter on October 18, 1990. It imme-diately became apparent that an examination and understanding of the history and present structure of the Peyote Religion and the Native American Church, as well as of 21 C.F.R. § 1307.31, is essential to a faithful resolution of the issues presented by Mr. Boyll's motions.

The following will constitute the Court's findings of fact and conclusions of law.

The peyote plant is a small, spineless cactus having psychedelic properties and the experience of eating it is central to the Peyote Religion.[1] Unlike traditional religions which have sacramental symbols such as bread and wine, peyote is more than a sacrament to members of the Native American Church. Peyote is, itself, considered a deity which cannot be owned by any individual. Peyote is worshiped and eaten at a religious ceremony called a peyote meeting. "Peyote is a sacred medicine; peyote protects; peyote allows one to see the future, or to find lost objects; peyote gives power to the user that may be manifest in various ways; peyote teaches; peyote may be used by Christians or may be incorporated with Christian ideas; a pilgrimage to gather peyote plants is viewed as an act of piety to be undertaken if possible...." Omer C. Stewart[2], *Peyote Religion* 41 (1987). It is considered sacrilegious to use peyote for nonreligious purposes.

The peyote ceremony is unique and the very cornerstone of the Peyote Religion. It is always conducted by individuals who hold honored posts which have specially assigned duties. The leader of the ceremony is called a "roadman." The roadman is responsible for inviting the participants, although worshipers who are not personally invited are usually welcomed as well. Other officials present at a peyote meeting

---

1. This Court is mindful that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants interpretation of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989).

2. Mr. Omer C. Stewart testified at the evidentiary hearing in this case. He is a distinguished scholar of the Peyote Religion. The Court found his testimony invaluable. Many of the Court's findings of fact relating to the Peyote Religion and the Native American Church can be attributed to Professor Stewart's testimony and his well-known book on the subject which was admitted into evidence as Defendant's exhibit 1.

include the chief drummer, who sits on the right of the roadman; the cedarman, who sits on the left of the roadman and sprinkles sagebrush "incense" on the fire; and the fireman or doorman, who tends the fire and sits near the opening of the tepee. Each meeting also has a sponsor who is responsible for securing a site, the roadman, the tepee and other materials necessary for the service. Although not all ceremonies of the Native American Church are identical, the general concepts have been so well defined, so established in traditional practice, that they have not changed significantly for nearly a hundred years. *Peyote Religion* at 36, 339–75. At these peyote meetings, the worshipers usually gather in a tepee at dusk and the ceremony passes through a series of ritualistic stages. During these rituals, a staff and a rattle are passed around and the person who receives them leads in singing peyote hymns and prayer. Around midnight, peyote is ingested by the worshipers and the singing, praying and drumming continues throughout the night until dawn. When the "buttons" of the plant are eaten, or brewed into tea and imbibed, the user experiences hallucinations. The peyote plant produces "a warm and pleasant euphoria, an agreeable point of view, relaxation, colorful visual distortions, and a sense of timelessness that are conducive to the all-night ceremony of the Native American Church." *Peyote Religion* at 3. Finally, at noon of the following day, all worshipers share in a ceremonial feast. *See generally Peyote Religion* at 327–336 (description of peyote ritual); T. Hillerman, *People of Darkness* 153 (1980) (description of Navajo peyote ritual).

The Native American Church combines elements of Christianity with traditional Native American beliefs and the sacramental use of peyote. *Peyote Religion* at 33; *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1485 (10th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990). Although the religious use of peyote has existed for centuries, the Peyote Religion's corporate form, the Native American Church, was established in Oklahoma in 1918. At that time, the leaders of the Peyote Religion reasoned that an "incorporated" church would provide greater protection from early attempts to suppress the use of peyote for religious purposes.

While the Oklahoma Chapter of the Native American Church is sentimentally referred to as the Mother Church, no single branch speaks for the numerous branches throughout the United States. Unlike more traditional churches, the Native American Church is a non-hierarchical church and has no central organization which dictates church policy. The Native American Church consists of a number of loosely affiliated local chapters. Each chapter is responsible for establishing its own charter, if it so chooses. "Each congregation makes its own rules, just as each meeting is conducted by its own roadman." *Peyote Religion* at 334. Nevertheless, the teachings of all the Native American Church chapters are essentially the same.

"Church" refers to a body of believers and their shared practices, rather than the existence of a formal structure or a membership roll. Membership in the Native American Church derives from the sincerity of one's beliefs and participation in its ceremonies. Historically, the church has been hospitable to and, in fact, has proselytized non-Indians. The vast majority of Native American Church congregations, like most conventional congregations, maintains an "open door" policy and does not exclude persons on the basis of their race. Racial restrictions to membership have never been a general part of Peyote Religion or of the Native American Church. *See Peyote Religion* at 333–34; *State v. Whittingham,* 19 Ariz.App. 27, 28, 504 P.2d 950, 951 (1973) (membership to non-Indians is usually not refused), *review denied,* 110 Ariz. 279, 517 P.2d 1275, *cert. denied,* 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 667 (1974). Although one branch of the Native American Church, the Native American Church of North America, is known to restrict membership to Native Americans, most other branches of the Native American Church do not. As a result, non-Indian

members are accepted within the Native American Church.[3]

Since attending his first ceremony of the Native American Church at Taos, New Mexico, in 1981, Mr. Boyll has been, and continues to be, an active member of the Native American Church. In fact, while living in Mill Valley, California, from 1981 until 1989, Mr. Boyll participated in ceremonies of the Native American Church an average of once every two to three weeks. Mr. Boyll often sponsored these meetings or participated as a drummer, cedarman or fireman. He sincerely believes in the teachings and practices of the Native American Church.[4] He has only used peyote in connection with bona fide religious purposes and has never been excluded from the Native American Church because of his non-Indian race.

In 1989, motivated in part by his commitment to the Native American Church, Mr. Boyll moved to New Mexico. He continues his active participation in meetings of Native American Church congregations in northern New Mexico and southern Colorado. During one specific peyote meeting, Mr. Boyll was explicitly recognized as a member of the Native American Church by Rutherford Loneman, a well-known roadman who is also a former Vice–Chairman of the Native American Church in Oklahoma. Yet, Mr. Boyll has always considered himself a member of the Native American Church rather than of a specific branch.

The act of traveling to the place where peyote is harvested is considered an act of piety which has its own rewards. The long, sacred pilgrimage to harvest peyote is considered to be one of the most important aboriginal traditions of the Peyote Religion. *Peyote Religion* at 31–32 ("When the [peyote]-seekers arrive [back] at their homes, the people turn out to welcome the plants with music, and a festival...."). Peyote is grown only in northern Mexico and the Rio Grande Valley of southern Texas. Peyote is not grown anywhere else and its growth area, especially in the United States, is being considerably depleted. *Peyote Religion* at 334–35.

Because the peyote fields in Texas are depleted, Mr. Boyll went on a "pilgrimage" to Mexico to obtain peyote for himself and members of the congregations with whom he worships. From Mexico, Mr. Boyll mailed the peyote to his post office box in San Cristobal, New Mexico, to avoid violating Texas law, which restricts religious possession and use of peyote only to Native Americans. *See* Tex. Health & Safety Code Anno. § 481.111 (Vernon 1989). On April 27, 1990, Mr. Boyll picked up the parcel of peyote from the post office in San Cristobal, New Mexico. He was on his way to deliver the peyote to Tellus Goodmorning, an elder of the Taos Pueblo and nationally respected roadman, when he was arrested.

The Court will first address whether 21 C.F.R. § 1307.21 applies to all sincere members of the Native American Church, in-

**3.** *See* Stacy Diven's affidavit (August 17, 1990) ("During my fifteen years as a member of the Native American Church, I have encountered isolated instances of opposition by Indian members of the church to non-Indian participation. However, in my experience, most Indian members of the Native American Church accept sincere white worshipers willingly"); John Kimmey's affidavit (August 3, 1990) ("The attempt by some members of the Native American Church and by the government to restrict membership in the church to Indians is foreign to the basic beliefs of many Native American Church members in the American Church of God [the Taos, N.M. branch] and in other branches of the Native American Church. Non-Indians have been and continue to be full, legitimate members both of the American Church of God and of other branches of the Native Ameri-

can Church."); Alden Naranjo's affidavit (August 15, 1990) ("As the son of practicing members of the Native American Church, I have been taught since early childhood that the door to our church is open to all faithful, sincere, and believing persons. Many non-Indians in my experience are and continue to be full legitimate members of the Native American Church. I regard any attempt to restrict membership to Indians as misguided").

**4.** *See* Lawrence Boyll's affidavit (August 2, 1990) (attesting to his sincere participation in the Native American Church); Stacy Diven's affidavit (Aug. 17, 1990) (same); Jimmy Reyna's affidavit (Aug. 1, 1990) (same); John Kimmey's affidavit (Aug. 3, 1990) (same); Alden Naranjo's affidavit (Aug. 15, 1990) (same).

cluding Mr. Boyll, or whether it excludes non-Indian members. Stated differently, does the federal exemption place a racial restriction on membership in the Native American Church?

■ As far back as the late 18th century, efforts were being made to restrict the ceremonial use of peyote. *See Peyote Religion* at 128–147. However, not until the popularity of psychedelic drugs in the 1960's did Congress restrict the possession, consumption and sale of peyote. *See* Drug Abuse Control Amendments of 1965, 79 Stat. 226 § 3(a). Thereafter, for the first time, peyote was classified as a Schedule I controlled substance. *See* Controlled Substance Act of 1970, 21 U.S.C. § 812(c), Schedule I(c)(12). But Congress never intended to prohibit the ceremonial use of peyote. *See Kennedy v. Bureau of Narcotics & Dangerous Drugs*, 459 F.2d 415, 419 (9th Cir.1972), *cert. denied*, 409 U.S. 1115, 93 S.Ct. 901, 34 L.Ed.2d 699 (1973); *Peyote Way Church of God, Inc. v. Meese*, 698 F.Supp. 1342, 1346 (N.D.Tex.1988); *Native American Church of New York v. United States*, 468 F.Supp. 1247, 1449–51 (S.D.N.Y.1979), *aff'd*, 633 F.2d 205 (2d Cir. 1980); *People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 73–74, 394 P.2d 813, 817–18 (1964). In implementing regulations, Congress exempted the religious use of peyote by members of the Native American Church. *See* 11 Cong.Rec. 14608, 15977 (1965); *see also Native American Church*, 468 F.Supp. at 1249–50; *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 197 n. 15 (5th Cir.1984). The Drug Enforcement Administration regulation relating to the listing of peyote as a controlled substance provides:

## SPECIAL EXEMPT PERSONS

### § 1307.31 Native American Church.

The listing of peyote as a controlled substance [under federal law] does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration.

21 C.F.R. § 1307.31. As many as twenty-three states have similar statutory or judicially crafted exemptions in their drug laws for the religious use of peyote. *See, e.g.,* N.M.Stat.Ann. § 30–31–6(D) (Supp.1989); Colo.Rev.Stat. § 12–22–317(3) (1990); Ariz. Rev.Stat.Ann. § 13–3402(B)(1)–(3) (1989); Kan.Stat.Ann. § 65–4116(c)(8) (1985); Utah Code Ann. § 58–37–3(3) (1986).

"The language of a regulation or statute is the starting point for its interpretation." *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir.1987) (citing *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "The plain meaning governs unless a clearly expressed legislative intent is to the contrary." *Id.* "When we find the terms of a statute unambiguous, judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981); *see also, e.g., Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir.1987).

The language of 21 C.F.R. § 1307.31 is clear, unambiguous and wholly consistent with the regulation's history and purpose. The plain language of 21 C.F.R. § 1307.31 exempts all worshipers engaged "in bona fide religious ceremonies of the Native American Church." The regulation plainly declares Congress' purpose to exempt Native American Church members. Nowhere is it even suggested that the exemption applies only to Indian members of the Native American Church. Had the intention been to exclude non-Indian members, as the United States argues, the language of the exemption would have so clearly provided. Indeed, the federal peyote exemption makes no reference whatsoever to a racial exclusion. *Compare* 21 C.F.R. § 1307.31 & N.M.Stat.Ann. 30–31–6(D) (Supp.1989) *with* Tex.Health & Safety Code Anno. § 481.111 (Vernon 1989) (including the language "[t]he exemption granted to members of the Native American Church under this section does not apply to a member with less than 25 percent Indian Blood"). The plain language of the federal peyote exemption applies to all members of the Native American Church, regardless of race. *Cf. Native American Church*, 468

F.Supp. at 1251 (rejecting the argument that the exemption should apply to "Indian" churches alone); *Kennedy*, 459 F.2d at 416–17 (rejecting the Government's proposed racial reading of the exemption: "[w]e cannot say that the Government has a lesser or different interest in protecting the health of Indians than it has in protecting the health of non-Indians").

A racially neutral reading of the exemption is consistent not only with the racially neutral language of the exemption but also with its legislative history. During hearings on the Controlled Substances Act of 1970, a representative of the Bureau of Narcotics and Dangerous Drugs, presently the Drug Enforcement Agency, explained the rationale for the special exemption and assured Congress that the exemption would not be affected by the new legislation:

> We consider the Native American Church to be sui generis. The **history and tradition of the church** is such that there is no question but that they regard peyote as a deity as it were, and we will continue the exemption. (emphasis added).

*Native American Church*, 468 F.Supp. at 1251 (quoting Drug Abuse Control Amendments of 1970, Hearing before the Subcommittee on Public Health & Welfare of the Committee on Interstate and Foreign Commerce, House of Representatives, 91st Cong., 2d Sess. 117–18 (1970)). Clearly, the nature and history of the Native American Church played a significant role in the promulgation of 21 C.F.R. § 1307.31. As the uncontradicted evidence in this case shows, the history of the Native American Church attests to the fact that non-Indian worshipers have always been, and continue to be, active and sincere members of the Native American Church.

The Government's racially restrictive reading and application of the exemption reveals a fundamental misunderstanding of the history and present structure of the Native American Church. Indeed, the Drug Enforcement Administration's own rationale acknowledges that the exemption is not based on the racial makeup of the Native American Church membership. *See*

*Olsen v. Drug Enforcement Admin.*, 878 F.2d 1458, 1465–1468 (D.C.Cir.1989) (final order of the Drug Enforcement Administration in connection with the exemption makes no mention of any distinction between Indian and non-Indian members of the Native American Church). While there may exist some legitimate support for the argument that Congress never intended to extend the exemption to non-Native American Church members, *see Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir.1991); *but see Native American Church*, 468 F.Supp. at 1249–51, the plain language of the exemption and the legislative history clearly support this Court's finding that Congress intended the exemption to apply to all members of the Native American Church, Indian and non-Indian alike.

The Court also finds persuasive Mr. Boyll's argument that to construe the racially neutral language of the exemption "to provide only racially discriminatory protection would place the exemption unnecessarily in direct conflict with the first amendment." Such a consequence would, at the very least, violate the canon of statutory construction that "[f]ederal statutes are to be construed as to avoid serious doubts of their constitutionality." *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961); *see also Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895); *United States v. Security Industrial Bank*, 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982). "[T]his principle is fully applicable to cases such as the instant one, in which a ... constitutionally suspect statutory interpretation is embodied in an administrative regulation." *Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 1778, 114 L.Ed.2d 233 (1991) (Blackmun, J., dissenting).

■ The Court will next address the constitutional question of whether the indictment violates Mr. Boyll's First Amendment right to freely exercise his religion. It is disingenuous for the Government to contend that its racially restrictive reading of 21 C.F.R. § 1307.31—which would restrict

religious freedom through the imposition of a racial exclusion—does not give rise to valid constitutional concerns. Since the use of peyote by Native American Church members is the very essence of their religious beliefs, the proposed racially restrictive reading of 21 C.F.R. § 1307.31 would have the sure effect of imposing a racial exclusion to membership in the Native American Church itself. To exclude individuals of a particular race from being members of a recognized religious faith is offensive to the very heart of the First Amendment. *See Walz v. Tax Comm'n of New York*, 397 U.S. 664, 668–69, 90 S.Ct. 1409, 1411–12, 25 L.Ed.2d 697 (1970) (the First Amendment's Establishment Clause ensures that governmental interference with religion will not be tolerated). In fact, there can be no more excessive entanglement of Government with religion than the Government's attempt to impose a racial restriction to membership in a religious organization. The decision as to who can and who cannot be members of the Native American Church is an internal church judgment which the First Amendment shields from governmental interference. *Cf. Paul v. Watchtower Bible & Tract Society*, 819 F.2d 875, 878, n. 1. (9th Cir.) (constitutionally improper for government to resolve a dispute about religious doctrine or practices), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). It is one thing for a local branch of the Native American Church to adopt its own restrictions on membership, but it is entirely another for the Government to restrict membership in a religious organization on the basis of race. Any such attempt to restrict religious liberties along racial lines would not only be a contemptuous affront to the First Amendment guarantee of freedom of religion but also to the Fourteenth Amendment right to equal justice under the law.

Applying the above-mentioned canon of statutory construction, we find that the United States' racially restrictive reading of 21 C.F.R. § 1307.31 does raise the sort of "grave and doubtful constitutional questions," *United States v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 535, 53 L.Ed. 836 (1909), that would lead this Court to assume Congress did not intend such an interpretation. *Federal Trade Comm'n v. American Tobacco Co.*, 264 U.S. 298, 305–307, 44 S.Ct. 336, 337–338, 68 L.Ed. 696 (1924) (assuming Congress legislates in the light of constitutional limitations).

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging of freedom, ... or the right of the people to assemble...." U.S. Const.Amend. I. While the freedom to act upon religious beliefs is not absolute, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). Traditional free exercise jurisprudence has long held that in order for government to substantially burden religiously motivated conduct, the Government must justify such restriction by a compelling state interest and use means narrowly tailored to achieve that interest. *See Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989); *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982); *Thomas v. Review Bd. of Indiana Employment Secur. Div.*, 450 U.S. 707, 717–19, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793–94, 10 L.Ed.2d 965 (1963).

In order for government action to withstand a challenge under the Free Exercise Clause, the action must satisfy the two-step analysis of the "compelling interest" test. The Court must first determine whether the Government's action "imposes any burden on the free exercise of [defendant]'s religion." *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1794. Then, if such a burden exists, the Court must "consider whether some compelling state interest ... justifies the substantial infringement of [defendant]'s First Amendment right." *Id.* at 406, 83 S.Ct. at 1795. "The compelling

interest test reflects the First Amendment's mandate of preserving religious liberty to the fullest extent possible in a pluralistic society." *Employment Division, Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1613, 108 L.Ed.2d 876 (1990) (O'Connor, J., concurring).

■ Recently, the Supreme Court in *Employment Division, Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876 (1990) ["*Smith*"], elected to abandon the compelling interest test in cases involving a "neutral, generally applicable [criminal] law," reasoning that the application of such a statute does not implicate First Amendment concerns. Accordingly—without the benefit of any constitutional scrutiny at all—the Court held that Oregon's across-the-board prohibition against peyote was constitutional.

■ This Court is convinced that 21 C.F.R. § 1307.31 is "specifically directed to religious practices and therefore not within the ambit of *Smith.*" *Salvation Army v. Dept. of Community Affairs of State of New Jersey,* 919 F.2d 183, 194, 204 (3d Cir.1990) (Becker, J., concurring). The Drug Enforcement Agency regulation in the present case, unlike the statute in *Smith,* is neither neutral nor generally applicable. Indeed, the plain language of the exemption speaks directly to "bona fide religious ceremonies of the Native American Church." Therefore, this Court will proceed to apply the traditional compelling interest test. *See Cf. Id.* 110 S.Ct. at 1603 ("where the [Government] has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardships' without compelling reason").

With respect to the first step of the analysis, it is uncontradicted that the racially restrictive interpretation of 21 C.F.R. § 1307.31 would impose a substantial burden on Mr. Boyll's free exercise of religion. On this issue, the Court's findings of fact and conclusions of law are not very different from those in *Woody,* 40 Cal.Rptr. at

72, 74, 394 P.2d at 816, 818, which concluded:

> An examination of the record as to the nature of peyote and its role in the religion practiced by defendants as [Indian and non-Indian] members of the Native American Church ... compels the conclusion that the [racially restrictive] prohibition most seriously infringes upon the observance of the religion.
>
> ....
>
> The record thus establishes that the [indictment for] ... the use of peyote results in a virtual inhibition of the practice of defendants' religion.

*Id.* Indian and non-Indian "believers who worship at the Native American Church cannot freely exercise their religious beliefs absent the use of peyote." *Whittingham,* 19 Ariz.App. at 29, 504 P.2d at 952. "There is no dispute that [the] criminal prohibition of peyote places a severe burden on the ability of [Defendant] to freely exercise [his] religion." *Smith* 110 S.Ct. at 1613 (O'Connor, J., concurring); *Peyote Way Church of God,* 742 F.2d at 200–01. Additionally, the Court finds that Mr. Boyll's trip to Mexico to obtain peyote is an integral part of the Peyote Religion practiced by the Native American Church. Such a substantial infringement necessarily triggers further First Amendment scrutiny.

The Court must next "consider whether some compelling [governmental] interest ... justifies the substantial infringement of [defendant]'s First Amendment right." *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795. While the Court is well aware that drug abuse is "one of the greatest problems affecting the health and welfare of our population" and, thus, "one of the most serious problems confronting our society today," *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 668, 674, 109 S.Ct. 1384, 1392, 1395, 103 L.Ed.2d 685 (1989), this amorphorous problem, without more, cannot justify the serious infringement on the observance of religion.

First, the United States has failed to present any evidence of a compelling interest to justify its actions in the present case.

"In the absence of evidence, we cannot simply assume that the psychedelic is so baneful that its use must be prohibited to a group of [non-Indian] members but poses no equal threat when used by [Indian] members of the Native American Church." *Peyote Way Church of God*, 742 F.2d at 201. In fact, in light of the absence of factual support and the scarcity of legal support for the United States' opposition to Defendant's motions to dismiss, this Court cannot help but believe that the present prosecution is, at best, an overreaction driven by political passions or, at worst, influenced by religious and racial insensitivity, if not outright hostility.

Finally, the existence of 21 C.F.R. § 1307.31 itself, negates the existence of a compelling governmental interest in prosecuting non-Indian members of the Native American Church for their religious use of peyote. *Id.* ("The exemption granted both by federal and [state] law to the ritual use of peyote by the Native American Church tends ... to negate the existence of a compelling [governmental] interest in the same use of it"). Indeed, the federal exemption explicitly establishes a governmental interest in preserving the exemption of peyote as a controlled substance for its ritual use by Indian and non-Indian members of the Native American Church. The only compelling interest in the present case is Congress' considered and continued conviction that the use of peyote in the Native American Church is the kind of free exercise of religion the First Amendment protects. *See, e.g., Native American Church*, 468 F.Supp. at 1249–50; *Peyote Religion*, 128–147. Finding no compelling interest to justify the constitutional infringement at issue, the Court need not reach the often critical question of balancing two competing interests.

Congress has articulated an unequivocal federal policy protecting the right of the Native American Church and its members to worship, possess and use peyote in bona fide religious ceremonies. This policy arises out of our country's recognition of the importance of individual freedom. For,

the right to free religious expression embodies a precious heritage of our history.

In a mass society, which presses at every point toward conformity, the protection of a self-expression, however unique, of the individual and the group become ever more important. The varying currents of the subcultures that flow into the mainstream of our national life give it depth and beauty.

*Woody*, 40 Cal.Rptr. at 77, 394 P.2d at 821; *see also* 111 Cong.Rec. 15977 (1965). The court in *Woody* eloquently speaks to the freedom of the individual.

Individual freedom, whether it be freedom of religion, expression or association, has been particularly important to maintaining the culturally diverse character of New Mexico. Here, we celebrate the right of the individual to revel in the passions of the spirit. The survival of this right owes much to the protection afforded by the First Amendment, which has allowed New Mexico's distinct cultures to learn mutual respect for each other's jealously-guarded customs and traditions. Diversity is New Mexico's enchantment.

For the reasons set out in this Memorandum Opinion and Order, the Court holds that, pursuant to 21 C.F.R. § 1307.31 (1990), the classification of peyote as a Schedule I controlled substance, *see* 21 U.S.C. § 812(c), Schedule I(c)(12), does not apply to the importation, possession or use of peyote for bona fide ceremonial use by members of the Native American Church, regardless of race.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that Defendant Robert Boyll's motions to dismiss the indictment be and hereby are GRANTED.